UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VERIZON WIRELESS OF THE EAST LP
d/b/a/ VERIZON WIRELESS *and* TARPON
TOWERS II, LLC,

Plaintiffs,

v.

TOWN OF WAPPINGER, TOWN OF
WAPPINGER PLANNIG BOARD, *and*
TOWN OF WAPPINGER ZONING BOARD
OF APPEALS,

Defendants.

No. 20-CV-8600 (KMK)

OPINION & ORDER

Appearances:

Christopher B. Fisher, Esq.
Brendan M. Goodhouse, Esq.
Cuddy & Feder, LLP
White Plains, NY
*Counsel for Plaintiff*

Adam Rodd, Esq.
Stephen J. Gaba, Esq.
Drake Loeb PLLC
New Windsor, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiffs Verizon Wireless of the East LP d/b/a Verizon Wireless ("Verizon") and

Tarpon Towers II, LLC ("Tarpon"; collectively, "Plaintiffs") bring this Action against the Town

of Wappinger ("Wappinger" or the "Town"), the Town of Wappinger Planning Board ("Planning

Board"), and the Town of Wappinger Zoning Board of Appeals, ("ZBA"; collectively,

"Defendants"), alleging that Defendants violated Section 332 of the Communications Act of

1934, as amended by the Telecommunications Act (TCA) of 1996, and regulations promulgated thereunder, for having failed to act or approve applications to install infrastructure to support wireless services. (*See* Compl. ¶¶ 1–2 (Dkt. No. 1).) Before the Court are Plaintiffs' and Defendants' dueling Motions for Summary Judgment. (Pls.'s Not. of Mot. (Dkt. No. 27); Defs.'s Not. of Mot. (Dkt. No. 32).) For the following reasons, Plaintiffs' Motion is granted in part and denied in part, and Defendants' Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically Plaintiffs' 56.1 Statement (Pls.'s Rule 56.1 Statement ("Pls.'s 56.1") (Dkt. No. 30)) and Defendants' Counterstatement (Defs.'s Rule 56.1 Counterstatement ("Defs.'s 56.1 Counter") (Dkt. No. 46)), Defendants' 56.1 Statement (Defs.'s 56.1 Statement) ("Defs.'s 56.1") (Dkt. No. 37) and Plaintiffs' Counterstatement (Pls.'s Rule 56.1 Counterstatement ("Pls.'s 56.1 Counter") (Dkt. No. 43)), and the admissible evidence submitted by the Parties. The facts as described below are in dispute only to the extent indicated.[1]

#### 1. The Parties and Third Parties

Verizon is an "FCC-licensed provider of commercial mobile services and personal wireless services . . . operat[ing] a fourth generation (4G) wireless network in and around the Town." (Defs.'s 56.1 Counter ¶¶ 1, 2).

---

[1] Where possible, the Court has relied on the undisputed facts in the Parties' 56.1 Counterstatements, evincing agreement. However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, where the Parties raise genuine disputes, or where the Parties did not accurately characterize the record.

Tarpon is a Florida corporation engaged in the business of developing and renting cellular towers.  (Pls.'s 56.1 Counter ¶ 5.)

The Town is a municipal corporation located in Dutchess County, New York.  (*Id.* ¶ 1.)[2]

Non-party Jeane Radice ("Radice") owns a 47-acre parcel of land, a portion of which resides in Wappinger.  (*Id.* ¶ 2.)

### 2.  The Town's Code

The Town maintains its own local rules, referred to as the Town Code.  Included in the Town Code is the Wireless Code, which contains the "standards and requirements for the regulation and placement of telecommunications towers, antennas and personal wireless service facilities."  (Defs.'s 56.1 Counter ¶ 20 (quoting Town Code § 240-8a(A)).)

The regulations comprising the Wireless Code

> are intended to be consistent with the Telecommunications Act of 1996 in that: (1) They do not prohibit or have the effect of prohibiting the provision of personal wireless services; (2) They are not intended to be used to unreasonably discriminate among providers of functionally equivalent services; and (3) They do not regulate personal wireless services on the basis of the environmental effects of radio frequency emissions to the extent that the regulated services and facilities comply with the FCC's regulations concerning such emissions.

(*Id.* ¶ 22 (quoting Town Code § 240-81(C)).)

---

[2] "Although neither party raises the issue, the Court observes that the proper defendant in this case is the Town, not the Town's agencies or boards."  *T-Mobile Ne. LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 463 n.5 (S.D.N.Y. 2009) (citations omitted); *see also MetroPCS New York, LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 419 (S.D.N.Y. 2010) ("In New York, however, agencies of a municipality are not suable entities because they are 'merely administrative arms of a municipality, [and] do not have a legal identity separate and apart from the municipality'" (quoting *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002))); *Omnipoint Commc'ns, Inc. v. Town of Lagrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) ("In New York, agencies of a municipality are not suable entities.") (collecting cases). Ultimately, "the distinction makes no practical difference," as any remedy the Court were to issue against the Town "also binds its administrative arms—including its Planning Board and [Zoning Board of Appeals]."  *Ramapo*, 701 F. Supp. 2d at 463 n.5.  Accordingly, the Court refers only to the Town henceforth as the defendant.

The Wireless Code "requires special permit and site plan approval from the Town's special permit granting authority (SPGA) for the construction of a personal wireless service facility or tower." (*Id*. ¶ 23 (citing Town Code § 240-81(D)(3)).) To obtain a permit, an applicant must submit an application to the SPGA that includes, "inter alia, a visual impact analysis that satisfies the following conditions":

> [a] A minimum of eight view lines in a zero-to-two-mile radius from the site, shown beginning at true North and continuing clockwise at forty-five-degree intervals.

> [b] A plan map of a circle two miles in radius of the facility site on which any visibility of the proposed tower from a public way shall be indicated.

> [c] Applicant shall utilize the U.S.G.S. Quadrangle Map, at a scale of 1 to 25,000 and submit profile drawings on a horizontal scale of one inch equals 400 feet, with a vertical scale of one inch equals 40 feet. Trees shall be shown at existing heights and at projected heights in 10 years.

(*Id*. ¶ 24 (italics omitted) (quoting Town Code § 240-81(F)(4)(f)[8]).)

Within 35 days of submitting an application, the applicant must also "conduct a publicly noticed balloon test, where it flies or raises a 3' diameter balloon at the maximum height of the proposed tower." (*Id*. ¶ 25 (citing Town Code § 240-81(F)(4)(f)[8]).)

Finally, the Wireless Code sets forth rules regarding where telecommunications equipment may be sited. First, the Wireless Code "requires that towers be no closer 'than 750 feet on a horizontal plane to an existing dwelling unit or day-care center, hospital, nursing home, church, synagogue or other place of worship.'" (*Id*. ¶ 27 (quoting Town Code § 240-81(G)(4)(c)).) Second, the Code "lists the following siting objectives:"

> 1) Visual/aesthetic: Siting so that the visual impact that is "least detrimental to highly rated scenic properties and historic areas . . ."

> 2) Diminution of residential property values: Siting in low population density areas.

> 3) Safety: Siting outside of floodplane zones or special food hazard areas.

> 4) Safety from excessive electromagnetic radiation.

5) Environmental degradation: Sited "to avoid affecting rare or endangered flora and fauna . . . [and] when possible, away from wetland areas."

6) If sited in a wooded area, "a vegetated buffer strip of undisturbed trees of at least 100 feet in depth (or less if determined by the SPGA to be sufficient) shall be retained . . . ."

(*Id*. ¶ 26 (quoting Town Code § 240-81(G)(4)).)

### 3.  New York State Environmental Quality Review Act ("SEQRA")

"SEQRA, enacted in 1975 . . . was designed, in part, to fill a gap left by the National Environmental Policy Act, which imposed an obligation on federal agencies to consider the environmental consequences of federally funded or approved projects."  *Wilder v. Thomas*, 854 F.2d 605, 609 (2d Cir. 1988) (citation omitted).  More specifically, "[t]he Legislature adopted SEQRA with the express intent that 'the protection and enhancement of the environment, human and community resources shall be given appropriate weight with social and economic considerations in public policy.'"  *New York City Coal. to End Lead Poisoning, Inc. v. Vallone*, 794 N.E.2d 672, 677 (N.Y. 2003) (quoting N.Y. Env't Conserv. Law §§ 8-0103(7)); *see also Lucas v. Plan. Bd. of Town of LaGrange*, 7 F. Supp. 2d 310, 314 (S.D.N.Y. 1998) ("SEQRA requires local planning boards to consider the potential environmental impact of a proposed project before granting site plan approval."); *City Council of City of Watervliet v. Town Bd. of Town of Colonie*, 822 N.E.2d 339, 341 (N.Y. 2004) ("SEQRA's primary purpose 'is to inject environmental considerations directly into governmental decision making.'" (quoting *Matter of Coca–Cola Bottling Co. v. Board of Estimate*, 532 N.E.2d 1261, 1263 (N.Y. 1988))).

"To insure [*sic*] that this laudable goal would be accomplished, the Legislature created an elaborate procedural framework requiring parties to consider the environmental ramifications of their actions . . . to 'the fullest extent possible.'"  *King v. Saratoga Cty. Bd. of Sup'rs*, 675 N.E.2d 1185, 1187 (N.Y. 1996) (quoting N.Y. Env't Conserv. Law §§ 8-0103(6)).  Moreover,

"[t]he mandate that agencies implement SEQRA's procedural mechanisms to the 'fullest extent possible' reflects the Legislature's view that the substance of SEQRA cannot be achieved without its procedure, and that departures from SEQRA's procedural mechanisms thwart the purposes of the statute.  Thus it is clear that strict, not substantial, compliance is required." *Id.*

Per the statutory scheme, an agency or municipal body of some kind is appointed as the "lead agency" when a project is proposed.  N.Y. Env't Conserv. Law § 8-0103(11).  That lead agency will make the initial determination as to whether the proposed action requires the production of an Environmental Impact Statement ("EIS").  *Id.*  "This determination is made according to whether a contemplated action falls within the definitions of 'Type I actions,' 'Type II actions,' or 'unlisted' actions." *Lucas*, 7 F. Supp. 2d at 315 (quoting 6 N.Y.C.R.R. § 617.6(a)(1)).

"Type II actions" are those "determined not to have a significant impact on the environment or are otherwise precluded from environmental review."  N.Y. Comp. Codes R. & Regs. tit. 6, § 617.5(a).  These include, e.g., minor repairs of existing facilities, installation of cable wires, or repaving roads.  *See id.* § 617.5(c). On the other hand, Type I actions are defined by the type of action, e.g., "the adoption of a municipality's land use plan," or the scope of a given action, e.g., "a project or action that involves the physical alteration of 10 acres." *Id.* § 617.4(b).  If an action falls into Type I or it falls into neither Type I nor Type II, meaning it is "unlisted," it requires the production EIS; if it falls into Type II, it does not.  *See id.* § 617.5.

The New York Administrative Code enumerates an "illustrative, not exhaustive," list of twelve criteria for the lead agency to determine the significance of a project's environmental impact, such as impacting the "air quality, ground or surface water, or quantity, traffic or noise levels." *Id.* § 617.7(c)(1)(i).  Ultimately, "[i]f the agency determines that an action is a type I

action or unlisted action subject to SEQR[A] and will not have a significant effect upon the

environment, it shall prepare, maintain and file a notice of determination that an EIS will not be

prepared," known as a negative declaration.  N.Y. Comp. Codes R. & Regs. tit. 9, § 586.8(a); *see

also* N.Y. Comp. Codes R. & Regs. tit. 6, § 617.7.

By contrast, "[i]f the agency determines that a type I or unlisted action is subject to

SEQR and may have a significant effect on the environment, it shall prepare, maintain and file a

notice of determination that an EIS will be prepared," known as a "positive declaration."  N.Y.

Comp. Codes R. & Regs. tit. 9, § 586.9(a); *see also* N.Y. Comp. Codes R. & Regs. tit. 6, § 617.7.

Completion of the EIS requires:

> a. preparation of a draft Scoping document identifying the areas of environmental significance to be reviewed in the EIS;
>
> b. public input on the draft Scope;
>
> c. adoption of the Scope (by the lead agency);
>
> d. preparation of the Draft EIS ("DEIS") (by the applicant);
>
> e. determination that the DEIS is complete (by the lead agency);
>
> f. public input on the DEIS;
>
> g. preparation of the Final EIS ("FEIS") (usually by the applicant);
>
> h. determination that the FEIS is complete (by the lead agency);
>
> i. issuance of a written Findings Statement (by the lead agency). . . .

[] Issuance of any of the required approvals could come only at the time the Findings Statement is promulgated.

*Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 420–21 (S.D.N.Y. 2010) (citing 6

N.Y.C.R.R. § 617), *aff'd*, 694 F.3d 208 (2d Cir. 2012); *see also Lucas*, 7 F. Supp. 2d at 315

(detailing the steps after a positive declaration).  There is little doubt that "a positive SEQRA

declaration necessarily delays a final decision."  *New York SMSA Ltd. P'ship v. Town of*

*Riverhead Town Bd.*, 118 F. Supp. 2d 333, 341 (E.D.N.Y. 2000), *aff'd*, 45 F. App'x 24 (2d Cir. 2002); *see also Nextel Partners of Upstate New York, Inc. v. Town of Canaan*, 62 F. Supp. 2d 691, 695 (N.D.N.Y. 1999) (referring to "the complexities inherent in the SEQRA process" as potentially giving rise to an "endless odyssey").

### 4.  The Proposed Cell Tower and the Town's Actions

"In May 2019, Tarpon entered into an option agreement with [Radice] with a 24-month term for a small portion" of Radice's land.  (Defs.'s 56.1 Counter ¶ 19.)  Tarpon proposed to construct a 150-foot-tall monopole that provides cellular telephone service (hereinafter "cell tower") on the portion of Radice's land for which it contracted and then rent the cell tower's operational capacity to Verizon.  (Pls.'s 56.1 Counter ¶ 6.)  Specifically, the proposed construction site was approximately 550 feet from a home in the Town and within 750 feet from six homes.  (*Id*. ¶¶ 10–11.)

On July 19, 2019, Tarpon contacted officials from the Town—specifically the Wappinger Town Attorney and the Zoning Enforcement Officer—to introduce the proposed cell tower idea. (Defs.'s 56.1 Counter ¶ 28.)  In August of that year, representatives for Plaintiffs met with these same officials to discuss the proposed application.  (*Id*. ¶ 29.)  During this meeting, the officials asked Tarpon to submit an application for various permits and another for a zoning variance.  (*Id*. ¶ 30.)  The officials also recommended that Tarpon submit a visual EAF and other supplemental materials.  (*See id*. ¶¶ 31–32.)

On October 9, 2019, Plaintiffs, and specifically Tarpon, submitted an application to the Planning Board seeking a "grant of special use permit, site plan approval, and wetland permit required for a proposed cell tower on Ms. Radice's land."  (Pls.'s 56.1 Counter ¶ 9; *see also* Defs.'s 56.1 Counter ¶ 33.)  In the cover letter to its application, "Tarpon gave an overview of

the Property, the proposed tower, the relevant zoning requirements and considerations, and

requested that it be placed on the agenda for the October 21, 2019[,] Planning Board meeting

where it could receive further input from the Planning Board on proposed phorograph locations

for the visual study required by the Town Code."  (Defs.'s 56.1 Counter ¶ 34.)  The application

itself

> included (a) a New York State Environmental Quality Review Act (SEQRA) full
> EAF and visual addendum, (b) a plan map of potential locations for photographs
> for the visual study, (c) an RF [radiofrequency] report from Verizon containing
> various coverage and propagation maps, charts and graphs of capacity utilization,
> and predictive propagation maps showing the increased coverage and capacity
> relief that would be provided by the proposed tower, (d) a site selection analysis
> report, and (e) site plans.

(*Id.* ¶ 36 (citations omitted).)

The same day, Tarpon submitted an application to the ZBA "seeking area variances to

allow construction of the cell tower less than 750 [feet] from the aforesaid residential dwellings."

(Pls.'s 56.1 Counter ¶ 12.)

On November 1, 2019, Plaintiffs submitted additional information and documentation in

support of its application, including:

> (i) Federal Aviation Administration Certification confirming that the proposed
> tower at the Property "does not exceed obstruction standards and would not be a
> hazard to air navigation . . ."; (ii) RF Compliance Certification confirming "the site
> will be compliant with FCC Guidelines in all publicly accessible areas [. . .] [ and]
> [w]ith the proposed Verizon Wireless antenna configuration in service, the
> exposure in all areas at ground level from this facility will be below 1% of the
> General Public MPE limit, or over 100 times less than the maximum allowed
> exposure in publicly accessible areas."; (iii) RF Non-interference letter stating that
> the proposed tower will not interfere "with other radio services, public safety
> communications, airport navigation, cordless phones, computers and other
> community office or residential household appliances."; (iv) revised site plans; and
> (v) Agricultural Data Statement.

(Defs.'s 56.1 Counter ¶ 51 (alterations in original) (citations omitted).)

On November 4, 2019, the Planning Board held a meeting wherein it "conducted an initial review of Tarpon's application, resolved to circulate a notice of intent to act as lead agency in review of the project under the New York State Environmental Quality Review Act ('SEQRA'), and approved the scheduling of a so-called 'balloon test' in December to help gauge the visual impacts of the proposed cell tower." (Pls.'s 56.1 Counter ¶ 15; *see also* Defs.'s 56.1 Counter ¶¶ 52–53, 57.) The Planning Board also "approved the scope of the visual study." (Defs.'s 56.1 Counter ¶ 57.) Indeed, during the meeting, "[n]either the Planning Board nor any Town officials or professionals identified any additional locations from which they believed Tarpon should take photos." (*Id*. ¶ 55.) Finally, the Planning Board expressed a desire to have an independent engineer review Verizon's determination in its RF report. (*Id*. ¶ 56.)

Following approval of the balloon float and the visual study scope, "Tarpon published notice of the balloon float in the Southern Dutchess News on November 20 and November 27 and mailed notice to all owners of property abutting the Property on November 27, 2019. Tarpon then conducted the balloon float on December 7, 2019." (*Id*. ¶ 58.)

Several weeks later, on December 23, 2019, Tarpon made another supplemental submission to the Planning Board and ZBA, which included the results of the balloon float test, known otherwise as a Visual Resource Evaluation (VRE), and an additional permit application, thereby completing its application and triggering the TCA's 150-day shot clock. (*Id*. ¶¶ 59–62.)[3] Shortly thereafter, the Planning Board circulated its intent to serve as lead SEQRA agency. (*Id*. ¶ 64.)

---

[3] As explained in much greater detail below, when applications are made by telecommunications providers to construct telecommunications infrastructure, municipalities are required to issue a decision thereon within a "reasonable time," which the FCC has determined to be approximately 150 days, barring extenuating circumstances or tolling agreements. *See infra* II.B.1a.

"On January 21, 2020, the Planning Board's engineering and planning consultants issued comment letters raising a number of technical issues requiring responses and submission of further pertinent information by Tarpon."  (Pls.'s 56.1 Counter ¶ 17.)  In the following months, Tarpon submitted additional information to the Planning Board to address the issues raised in the January 21, 2020, letter.  (*Id.* ¶ 19.)

The next day, following the New York State Department of Environmental Conservation's reply several days earlier, which contained no substantive objection to the idea, the Planning Board passed resolutions during its meeting to assume its status as the SEQRA lead agency and to retain an independent RF consultant for the project.  (Defs.'s 56.1 Counter ¶¶ 65–67.)  And, once again, during this meeting, "[n]either the Planning Board nor any of the Town's professionals raised any issue with respect to either the scope or completeness of the VRE."  (*Id.* ¶ 70.)

The Planning Board had not made a SEQRA determination of significance by February 12, 2020, which was twenty days after Plaintiffs had submitted their application.  (*Id.* ¶ 71.)[4]

---

[4] Plaintiffs imply this delay violates New York law.  (*See* Pls.'s 56.1 ¶ 71; *see also* Pls.'s Mem. 5 & n.4 (citing 6. N.Y.C.R.R. 617.6(b)(1)(ii)).)  The Town disputes this, saying that Plaintiffs failed to cite to specific legal provisions or "reference any evidence" in their Rule 56.1 Statement.  (Defs.'s 56.1 Counter ¶ 71.)  Disputes asserted absent factual support do not create disputes of fact.  *See United States v. Gentges*, 531 F. Supp. 3d 731, 735 (S.D.N.Y. 2021) ("Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed."); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 418–19 (S.D.N.Y. 2014) (collecting cases).  Additionally, "the Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) (collecting cases), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019); *see also Unterberg v. ExxonMobil Oil Corp.*, 203 F. Supp. 3d 324, 326 n.1 (S.D.N.Y. 2016) ("To the extent that [the] [p]laintiff's [] Rule 56.1 statement improperly includes legal conclusions, this Court will disregard such statements when determining whether there are genuine issues of material fact."); *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 509 n.12 (S.D.N.Y. 2003) (disregarding legal conclusions made in Rule 56.1 statement).  The Town's alleged violation of New York State

In March 2020, the independent RF consultant retained by the Town, Douglas Fishman, favorably reviewed Verizon's RF report, stating that it was "thorough." (*Id.* ¶ 72.) Fishman did, however, "question whether adequate service could still be provided from a lower tower height and stated he would like to see propagation maps for such heights." (*Id.* ¶ 73.)

That same month, Tarpon made another supplemental submission to the Planning Board, which included "updated site plans, a noise analysis, stormwater calculations, and a responsive comment memorandum" as well as its "correspondence with the Army Corp of Engineers and the New York State Historical Preservation Office." (*Id.* ¶¶ 74–76 (citations omitted).)

The following month, Plaintiffs responded to Fishman's comments and request, addressing his concerns and further explaining why a lower height could not provide adequate coverage. (*Id.* ¶¶ 77–81.) Fishman subsequently agreed, stating that the cell tower project "is really the best solution" and stating that following these supplemental submissions, the "[a]pplication now appears to be complete and acceptable from an RF Engineering Standpoint." (*Id.* ¶¶ 82–83.)

On May 4, 2020, the Planning Board held a meeting via Zoom in which it again considered the application. (Pls.'s 56.1 Counter ¶ 22; Defs.'s 56.1 Counter ¶ 85.)[5] Neither the Planning Board nor any town officials identified additional photo locations or views Tarpon needed to submit to supplement its application. (Defs.'s 56.1 Counter ¶ 86.) During the meeting, the Planning Board also agreed to hold a public hearing on May 18, 2020. (Pls.'s 56.1

---

Law is not a claim put forward by Plaintiffs. Accordingly, the Court only cites to the undisputed fact that the Planning Board had not made a determination by February 12, 2020, and that this date was twenty days after the application was deemed completed and submitted.

[5] "Zoom is a cloud-based peer-to-peer software platform used for, inter alia, video and audio conferencing." *Chain v. N. E. Freightways, Inc.*, No. 16-CV-3371, 2021 WL 1611953, at *1 n.2 (S.D.N.Y. Apr. 26, 2021) (italics omitted).

Counter ¶ 22; Defs.'s 56.1 Counter ¶ 87.)  Finally, at the conclusion of this meeting, "Tarpon expressly recognized that the Planning Board was acting reasonably and expeditiously on its application (particularly in light of the Covid pandemic) and Tarpon voluntarily extended the TCA 'shot clock' to July 5, 2020, which . . . Tarpon confirmed in writing on May 15, 2020." (Pls.'s 56.1 Counter ¶ 23; *see also* Defs.'s 56.1 Counter ¶ 87.)

Prior to the May 18, 2020, public hearing, in response to previous comments made by the Planning Board, the Town Engineer, and the Town Planner, Tarpon made yet another supplemental submission comprised of various new and updated visual reports and schematics. (Defs.'s 56.1 Counter ¶ 88.)

At the May 18, 2020, public hearing, once again conducted via Zoom, "neighboring property owners appeared and voiced objections and concerns" regarding the proposed cell tower.  (Pls.'s 56.1 Counter ¶¶ 24–25; *see also* Defs.'s 56.1 Counter ¶ 90.)  The Planning Board held the public hearing open until its July 6, 2020, meeting.  (Pls.'s 56.1 Counter ¶ 26.)

Within two weeks of the May 18, 2020, meeting, Tarpon made further submissions to the ZBA and Planning Board "in which it responded to comments from the May 18 public hearing and provided, inter alia, studies showing a lack of diminution of property values following installation of wireless facilities."  (Defs.'s 56.1 Counter ¶ 93 (italics omitted); *see also id.* ¶¶ 94–95.)[6]  Additionally, Tarpon agreed to extend the shot clock another 45 days to August 19, 2020.  (*Id.* ¶ 96; Pls.'s 56.1 Counter ¶ 27.)

---

[6] The Town disputes this and cites evidence to "aver[] that cell tower installations may result in appreciable diminution of property values."  (Defs.'s 56.1 Counter ¶ 95.)  The substantive fact on which the Court relies here is only the submission itself and the contents thereof; the Court does not take a position as to whether installing cellular towers may result in the diminution of property values.

On June 11, 2020, Andrew Campanelli, an attorney representing some number of neighboring property owners, submitted a memorandum opposing the project in which he argued that Tarpon's application should be rejected for several reasons, including: an insufficient need for the cell tower as evidenced by Verizon's marketing and from insufficient data submitted; a defective visual test for sake of Tarpon's failure to submit certain photographs; and the substantial diminution of property values if the tower were approved.  (Defs.'s 56.1 Counter ¶ 98–99; *see also* Decl. of Brendan Goodhouse ("Goodhouse Decl. I") (Dkt. No. 29) Ex. 2 (Administrative Record) ("AR") 943–977 (Dkt. No. 29-2).)

The ZBA next held a public hearing on June 23, 2020, in which it discussed the necessary variances to be issued for the project.  (Pls.'s 56.1 Counter ¶ 28.)  At this meeting, in response to a question as to whether the facility could be moved, Tarpon explained that doing so "would have resulted in additional wetland disturbance."  (Defs.'s 56.1 Counter ¶ 101.)  Additionally, "the ZBA explained that under New York State law it could not take any action on Tarpon's application until the Planning Board, as SEQRA lead agency, had completed SEQRA review."  (Pls.'s 56.1 Counter ¶ 29.)  The ZBA thus held the hearing open until the completion of the Planning Board's SEQRA review as lead agency.  (*Id.* ¶ 30.)

The day after the ZBA's public hearing, Fishman, in his capacity as the Town's independent RF consultant, responded to Campanelli's claims with respect to insufficient data, concluding that notwithstanding the attorney's assertions, the data was sufficient and "that in [his] professional opinion, Verizon's response was thorough and complete."  (Defs.'s 56.1 Counter ¶¶ 106, 104–07 (quotation marks omitted).)

In late June 2020, both the New York Department of State and the Federal Aviation Association cleared the proposed project.  (*Id.* ¶¶ 108–09.)

14

On July 3, 2020, Tarpon made another supplemental submission with further revisions to zoning drawings and additional reports, among other things.  (*Id.* ¶ 110.)

At the continued public hearing on July 6, 2020, several members of the public spoke at the hearing and voiced their concerns.  (*Id.* ¶ 116.)  Campanelli also reprised the position he took in his memorandum, stating that Tarpon's submission was defective.  (Pls.'s 56.1 Counter ¶¶ 32–34; Defs.'s 56.1 Counter ¶ 113.)  When pressed for an alternative to address the coverage issues identified by Verizon, "the attorney did not identify specific less impactful locations."  (Defs.'s 56.1 Counter ¶ 115.)  "Toward the end of the meeting, the Planning Board passed a unanimous resolution directing the Town Planner to draft a written SEQRA declaration of negative significance, which the Planning Board would review and confirm at the July 20, 2020."  (*Id.* ¶ 119.)  Once again, the Planning Board held the hearing open to July 20, 2020.  (Pls.'s 56.1 Counter ¶ 35.)

Following the July 6, 2020, hearing, per the resolution, the Town Planner circulated a draft negative declaration addressing all of the SEQRA criteria for determination of significance, finding that the proposed cell tower "would not have a significant impact . . . ."  (*Id.* ¶¶ 121, 122–25.)[7]  The draft negative declaration included multiple paragraphs explaining why the proposed cell tower "will not have a significant adverse environmental impact on any scenic or aesthetic resources."  (AR 1422–1423.)

During the July 20, 2020, Planning Board meeting, the Board voted to close the public hearing over Campanelli's objection and requested Tarpon provide: "(1) an analysis of visual impacts from neighboring properties (i.e., 500'); (2) a real estate appraiser's report on the

---

[7] Also, following the public hearing, Tarpon submitted a noise study to confirm that the wireless equipment would emit very little noise and comply with relevant noise codes.  (*Id.* ¶ 120.)

impacts of cell towers on property prepared with reference to local property values; and (3) clarification on the alternate locations study previously provided (particularly in regard to the alleged refusal of other viable sites to allow construction of the proposed cell tower)."  (Pls.'s 56.1 Counter ¶¶ 36–37; *see also* Defs.'s 56.1 Counter ¶¶ 127–29.)[8]

On July 24, 2020, the Chairman of the Planning Board sent a comment letter on the Planning Board's behalf to Tarpon requesting additional information.  (Pls.'s 56.1 Counter ¶ 40; Defs.'s 56.1 Counter ¶ 134.)  This letter stated that, from the Town's vantage point—and that of its Planning Board—the visual tests performed as well as the results thereof were "defective." (Defs.'s 56.1 Counter ¶ 131.)  The Parties dispute whether the comment letter offered an adequate explanation as to why "the Planning Board was making this determination seven months after it had accepted the VRE" or "why the Planning Board determined the VRE was defective after directing the Town Planner to draft a negative declaration with the finding that the Facility would not create an adverse visual impact."  (*Id.* ¶¶ 132, 133.)  Finally, the Parties do not dispute that the letter also requested that Tarpon review three alternative sites for the cell tower, including one it had already reviewed and determined would not be viable.  (*Id.* ¶ 135.)

On July 29, 2020, Tarpon performed additional "field investigations" to evaluate visibility concerns using balloons and drones.  (*See id.* ¶¶ 137–43.)  These visuals taken in these investigative tests were submitted to the Planning Board on August 18, 2020, along with the requested site selection analysis and market study regarding property values in the area.  (*Id.*

---

[8] The Parties dispute some of the interactions that transpired during this meeting, however.  (*See* Pls.'s 56.1 Counter ¶¶ 38–39; Defs.'s 56.1 Counter ¶¶ 126, 129–30).  However, these disputes do not come to bear on the Action itself.

¶¶ 145–49).  This submission once again included an extension to the TCA shot clock through August 31, 2020.  (Pls.'s 56.1 Counter ¶ 42; Defs.'s 56.1 Counter ¶ 150.)[9]

At the Planning Board's meeting on September 9, 2020, the Planning Board voted to prepare a SEQRA Positive Declaration, which would require preparing an Environmental Impact Statement.  (Pls.'s 56.1 Counter ¶ 44; Defs.'s 56.1 Counter ¶ 151.)

The Parties dispute the impetus for the change from a negative declaration to a positive one.  Plaintiffs claim that there was no "change in circumstance or new information" since the decision to draft a negative circulation, while the Town avers that "[t]he Planning Board adopted the positive declaration as a result of Tarpon's refusal to provide the visual impact information requested."  (Defs.'s 56.1 Counter ¶ 152.)

The Planning Board then voted at its subsequent meeting on September 21, 2020, to adopt the draft positive declaration.  (Pls.'s 56.1 Counter ¶ 45; Defs.'s 56.1 Counter ¶ 153.)  The positive declaration stated: "The Planning Board believes that the potential may exist for the proposed monopole or monopine to conflict with the legislative intent of § 240-81 of the Town code which addresses telecommunications towers, antennas, and personal wireless service facilities."  (Defs.'s 56.1 Counter ¶ 154 (quotation marks omitted).)  The Town admits that the "positive declaration did not explain the Planning Board's basis for concluding that Tarpon's proposed tower conflicts 'with the legislative intent of § 240-81 of the Town Code.'"  (*Id.* ¶ 155 (quoting AR 1818–1819).)  The declaration also stated:

> The Planning Board believes that the potential may exist for the proposed monopole or monopine to result in significant adverse visual impact to the surrounding community which is bucolic and historically agricultural in nature thereby

---

[9] A subsequent extension was granted by Tarpon through September 21, 2020.  (Pls.'s 56.1 Counter ¶ 43.)

potentially causing significant adverse impairment to the character or quality of the existing community and the aesthetic resources of the surrounding area.

(Defs.'s 56.1 Counter ¶ 156 (quoting AR 1818).)  However, the declaration "did not explain the Planning Board's basis for its conclusion."  (Defs.'s 56.1 Counter ¶ 157.)

The proposed cell tower project has not been before the Planning Board or ZBA since the September 21, 2020, meeting.  (Pls.'s 56.1 Counter ¶ 49.)

B.  Procedural History

Plaintiffs filed their complaint on October 15, 2020.  (*See* Compl. (Dkt. No. 1).) Following a stipulation extending the time to respond, (*see* Dkt. No. 16), the Town filed an Answer on December 3, 2020, (*see* Dkt. No. 17.)

Pursuant to the Parties' proposed briefing schedule (*see* Dkt. No. 26), on March 5, 2021, Plaintiffs filed their Motion for Summary Judgment and accompanying papers and exhibits as well as a Rule 56.1 Statement.  (*See* Pls.'s Not. of Mot.; Pls.'s Mem. in Supp. of Pls.'s Mot. for Summ. Judg. ("Pls.'s Mem.") (Dkt. No. 31); Pls.'s 56.1; Goodhouse Decl. I.)  On the same day, the Town filed its Motion for Summary Judgment and accompanying papers and exhibits as well as a Rule 56.1 Statement.  (*See* Defs.'s Not. of Mot.; Defs.'s Mem. in Supp. of Defs.'s Mot. for Summ. Judg. ("Defs.'s Mem.") (Dkt. No. 36); Defs.'s 56.1; Decl. of Stephen J. Gaba ("Gaba Decl.") (Dkt. No. 33).)

On April 5, 2021, Plaintiffs filed its Counter to the Town's Rule 56.1 Statement, a Memorandum of Law in Opposition to Defendants' Motion For Summary Judgment, and a declaration in support thereof.  (*See* Pls.'s 56.1 Counter; Declaration of Brendan Goodhouse (Dkt. No. 41); Pls.'s Mem. in Opp. of Defs.'s Mot. for Summ. Judg. ("Pls.'s Opp. Mem.") (Dkt. No. 42).)  That day, the Town filed parallel papers.  (*See* Defs.'s 56.1 Counter; Declaration of

18

Stephen Gaba (Dkt. No. 44); Defs.'s Mem. in Opp. of Pls.'s Mot. for Summ. Judg. ("Defs.'s Opp.") (Dkt. No. 45).)

Two weeks later, on April 16, 2021, the Parties filed reply memorandums of law in support of their respective Motions. (*See* Pls.'s Reply Mem. in Supp. of Pls.'s Mot. for Summ. Judg. ("Pls.'s Reply Mem." (Dkt. No. 48); Defs.'s Mem. in Supp. of Defs.'s Mot. for Summ. Judg. ("Defs.'s Reply Mem.") (Dkt. No. 50).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quoting *Wilson v. NW Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323–24). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

"Where, as here, cross motions for summary judgment are filed, [courts] 'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)); *see also Dish Network Corp. v. Ace Am. Ins. Co.*, No. 20-0268, 2021 WL 6058146, at *3 (2d Cir. Dec. 22, 2021) ("When both parties have moved for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" (quoting *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017))); *Est. of Smith v. Cash Money Recs., Inc.*, No. 14-CV-2703, 2018 WL 2224993, at *3 (S.D.N.Y. May 15, 2018) ("On dueling motions for summary judgment, the court must evaluate each party's motion on its merits and determine whether either is entitled to judgment as a matter of law" (citing *Coutard*, 848 F.3d at 114)).

B.  Analysis

1.  The TCA

"Congress enacted the [TCA] to promote competition and higher quality in American telecommunications services and to encourage the rapid deployment of new telecommunications technologies." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 115 (2005) (citation and quotation marks omitted); *see also Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 492–93 (2d Cir. 1999) ("The TCA was intended, in the words of the Conference Committee: 'to

provide for a pro-competitive, de-regulatory national policy framework designed to accelerate

rapidly private sector deployment of advanced telecommunications and information technologies

and services . . . by opening all telecommunications markets to competition . . . .'" (quoting H.R.

Conf. Rep. No. 104–458, at 206 (1996))).

a.  Removal of Local Barriers

"One of the means by which it sought to accomplish these goals was reduction of the

impediments imposed by local governments upon the installation of facilities for wireless

communications, such as antenna towers." *Rancho Palos Verdes*, 544 U.S. at 115.  "To this end,

the TCA . . . imposes specific limitations on the traditional authority of state and local

governments to regulate the location, construction, and modification of such facilities." *Id.*

(citation omitted).  Specifically, this limitation provides:

> (ii) A State or local government or instrumentality thereof shall act on any request
> for authorization to place, construct, or modify personal wireless service facilities
> within a reasonable period of time after the request is duly filed with such
> government or instrumentality, taking into account the nature and scope of such
> request.

47 U.S.C. § 332(c)(7)(B)(ii).

"The FCC—the federal agency charged with enforcing the TCA—established that such a

reasonable time is 'presumptively, 90 days to process personal wireless service facility siting

applications requesting collocations, and, also presumptively, 150 days to process all other

applications.'"  *Up State Tower Co., LLC v. Town of Kiantone, New York*, 718 F. App'x 29, 31

(2d Cir. 2017) (summary order) (quoting *In the Matter of Petition for Declaratory Ruling to*

22

*Clarify Provisions of Section 332(c)(7)(b)*, 24 F.C.C. Rcd. 13994, FCC 09-99, 2009 WL

3868811, ¶ 32 (Nov. 18, 2009) [hereinafter 2009 FCC Order]).[10]

      Nine years later, the FCC would issue two follow-on rulings regarding the scope and

effect of these shot clocks as well as general implementation of the TCA.  *See generally In the*

*Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure*

*Inv.*, FCC 18-30, 2018 WL 1559856 (Mar. 30, 2018) [hereinafter "Mar. 2018 FCC Order"]; *In*

*the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to*

*Infrastructure Inv.*, 33 FCC Rcd. 9088, FCC 18-133, 2018 WL 4678555 (Sep. 26, 2018)

[hereinafter "Sep. 2018 FCC Order"].

<u>b.  Effective Prohibition</u>

      The TCA ensures that local governments retain authority over "decisions regarding the

placement, construction, and modification of personal wireless service facilities."  47 U.S.C. §

332(c)(7)(A).  However, pursuant to its goal of spreading telecommunications access more

broadly, the TCA also bars said municipalities from, inter alia, "prohibit[ing] or hav[ing] the

effect of prohibiting the provision of personal wireless services."  *Id*. § 332(c)(7)(B)(i)(II).  This

section has accordingly been referred to as the "effective prohibition provision."  *Orange Cty.–*

*Poughkeepsie Ltd. P'ship v. Town of E. Fishkill*, 84 F. Supp. 3d 274, 294 (S.D.N.Y.) (citing

*Ramapo*, 701 F. Supp. 2d at 463), *aff'd*, 632 F. App'x 1 (2d Cir. 2015).  The Second Circuit has

clearly stated that this subclause "precludes denying an application for a facility that is the least

---

      [10] The FCC's authority to promulgate this regulation was upheld by the Fifth Circuit and subsequently affirmed by the Supreme Court.  *See Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y.*, No. 12-CV-6157, 2013 WL 3357169, at *13 (S.D.N.Y. July 3, 2013), *aff'd*, 552 F. App'x 47 (2d Cir. 2014) (citing *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 256 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013)).  For that reason, the time limits on the Shot Clock are not at issue in this Action.

intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land lines." *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999).

### c.  Remedy

"The TCA does not specify a remedy for violations of the cellular siting subsection." *Oyster Bay*, 166 F.3d at 497.  In fact, "[w]hen the FCC received comments on 47 C.F.R. § 1.6003 [the federal regulation codifying the 2009 FCC Shot Clock Order], several commenters advocated for the FCC to 'adopt a deemed granted remedy.'" *Crown Castle Fiber LLC v. City of Charleston*, No. 20-CV-2692, 2021 WL 538148, at *8 (D.S.C. Feb. 15, 2021) (quoting Sep. 2018 FCC Order ¶ 128).  But "[t]he FCC declined to do so, explaining that it is 'confident that the rules and interpretations adopted here will provide substantial relief, effectively avert unnecessary litigation, allow for expeditious resolution of siting applications, and strike the appropriate balance between relevant policy considerations and statutory objectives guiding [its] analysis.'" *Id.* (quoting Sep. 2018 FCC Order ¶ 128).

While the Second Circuit has not weighed in on the requisite remedy for a violation of the shot clock order or the "reasonable period of time" provision, another court in this district opined in dicta that "the only reasonable [equitable] relief for such a failure [would be] to require a written decision" in a limited amount of time.  *Greenburgh*, 2013 WL 3357169, at *17 (quoting *Clear Wireless, LLC v. City of Wilmington*, No. 10-CV-218, 2010 WL 3463729, at *4 (D. Del. Aug. 30, 2010)).

On the other hand, "under *Willoth*, a violation of the effective prohibition provision requires injunctive relief: an application proposing the 'least intrusive means for closing a

significant [coverage] gap' cannot be denied—or, put differently, it must be granted." *Ramapo*, 701 F. Supp. 2d at 463 (citation omitted) (quoting *Willoth*, 176 F.3d at 643).

### 2. Reasonable Delay and FCC Shot Clock Claim

In broad strokes, Plaintiffs argue that summary judgment is appropriate for its claim that the Town violated the FCC's shot clock order and the reasonable period of time provision because the Town improperly delayed taking action on their application. (*See* Pls.'s Mem. 9–19.) Accordingly, Plaintiffs assert, the appropriate remedy is an order directing the Town to issue all necessary approvals and authorizations such that Plaintiffs may construct the cell tower as proposed. (*See id.* 19–22.)[11]

On the other hand, the Town argues that the positive declaration was not pretextual but was instead properly adopted. (*See* Defs.'s Opp. 9–16.) Thus, the Town argues, summary judgment in its favor is appropriate because both the Planning Board and ZBA acted on the cell tower application within a reasonable period of time considering the circumstances and context. (*See id.* 16–18.)

The 2009 FCC order states that a "reasonable period of time" is "*presumptively*, 90 days to process personal wireless service facility siting applications requesting collocations, and, also *presumptively*, 150 days to process all other applications." 2009 FCC Order ¶ 32 (emphases added). However, that a final determination was not made by the shot clock, including its tolling periods, does not guarantee victory for a plaintiff. Rather,

> the FCC recognized that "certain cases may legitimately require more processing
> time" and therefore provided that the deadlines could be extended by agreement of

---

[11] Though Plaintiffs detail why they believe the declaration was issued pretextually, they do not did not assert a TCA claim on that specific basis, which requires that a decision made be "supported by substantial evidence." 47. U.S.C. § 332(c)(7)(B)(iii). Instead, Plaintiffs leverage these facts solely in service of their unreasonable delay claim. (*See* Pls.'s Mem. 15–19.) Thus, "it is unnecessary to reach that claim here." *Ramapo*, 701 F. Supp. 2d at 456 n.3.

> the applicant or that the shot clock may be tolled to obtain certain required information.  The FCC also clarified that . . .  [a] "local authority will have the opportunity, in any given case that comes before a court, to rebut the presumption that the established timeframes are reasonable" based upon the "unique circumstances in individuals cases."

*Upstate Cellular Network v. City of Auburn*, 257 F. Supp. 3d 309, 315 (N.D.N.Y. 2017) (quoting 2009 FCC Order ¶¶ 3, 42, 44).  Therefore, if the presumption is established, a court must review the reasons provided by the municipality for the delay and adjudge its reasonableness.

In the case at bar, as detailed below, Plaintiffs can establish this presumption in light of the time the Town had taken—at the time Plaintiffs filed the Complaint—to work through the application, subtracting the time accounted for in the several tolling agreements in which the Parties entered.  The Town, however, cannot rebut this presumption, notwithstanding some of the issues it faced along the way, particularly when considering the Town's late-stage request for additional information and the subsequent issuance of the Town's Positive Declaration, thereby triggering SEQRA.  Indeed, the Court concludes that doing so "was done merely to delay the permitting process in contravention of the Federal statute and the FCC Order."  *Bell Atl. Mobile of Rochester L.P. v. Town of Irondequoit, N.Y.*, 848 F. Supp. 2d 391, 401 (W.D.N.Y. 2012).  Accordingly, Plaintiffs' Motion on this claim is granted, and the Town's Motion on this claim is denied.

### a.  Summary Timeline of Events Create Rebuttable Presumption

A recitation of the facts detailed above establish that the Town was presumptively unreasonable.  Tarpon's incomplete application to both the Planning Board and the ZBA was first submitted on October 9, 2019.  (*See* Pls.'s 56.1 Counter ¶ 9 (submitting the application to the Planning Board); Defs.'s 56.1 Counter ¶ 33 (same); Pls.'s 56.1 Counter ¶ 12 (submitting an application to the ZBA for the variances).)  Tarpon submitted additional information in several

tranches in the following weeks.  (*See* Defs.'s 56.1 Counter ¶¶ 51–53, 59–62.)  The Town admits

that these submissions rendered the application complete by December 23, 2019.  (*See* Defs.'s

56.1 Counter ¶ 59.)  Under the FCC shot clock orders, this triggered the Town's deadlines for a

final determination on May 20, 2020.  *Cf.* 2009 FCC Order ¶ 52 ("We concur that the timeframes

should take into account whether applications are complete.  Accordingly, we find that when

applications are incomplete as filed, the timeframes do not include the time that applicants take

to respond to State and local governments' requests for additional information.")

   At the suggestion of its Town Planner, following the submission of Tarpon's complete

application, the Town circulated its intent to serve as lead SEQRA agency.[12]  (*See* Pls.'s Mem.

13 & n.14).  The Town held a Planning Board meeting on May 4, 2020, to fully consider the

complete application.  At the conclusion of this meeting, the Town had not made a final

determination on the application.  Nonetheless, Plaintiffs concede that they "expressly

recognized that the Planning Board was acting *reasonably and expeditiously* on its application

(particularly in light of the Covid pandemic)."  (Pls.'s 56.1 Counter ¶ 23 (emphasis added).)

Also, "Tarpon voluntarily extended the TCA 'shot clock' to July 5, 2020, which . . . Tarpon

confirmed in writing on May 15, 2020."  (*Id*.)  Added all up, 134 of 150 days had elapsed,

meaning the shot clock would re-commence on July 5, 2020, and would expire on July 21, 2020.

---

[12] Tarpon first spoke with officials from the Town in July 2019, regarding an intent to apply for, and subsequently build, a new cell tower.  (Defs.'s 56.1 Counter ¶ 28.)  As such, the Town was on notice of an impending application that would require at least an initial SEQRA determination.  The Town waited until the application was completed, notwithstanding months of headway, to circulate an intent to nominate a given agency to lead.  (*Id*. ¶ 64.)  Plaintiffs do not contest that decision, simply remarking that the Town Planner advised the Planning Board that "once [it] believed it had received all necessary information it should circulate its intent to serve as lead agency."  (Pls.'s Mem. 13 & n.14).

On May 29, 2020, before the shot clock was set to restart, Tarpon agreed to extend the shot clock another 45 days to August 19, 2020, in conjunction with making a supplemental submission. (*See id*. ¶ 27; Defs.'s 56.1 Counter ¶ 96.) This occurred once again on August 18, 2020, when Tarpon's submission included an extension to the TCA shot clock through August 31, 2020. (Pls.'s 56.1 Counter ¶ 42; Defs.'s 56.1 Counter ¶ 150.) The final extension Tarpon granted extended the shot clock through September 21, 2020. (Pls.'s 56.1 Counter ¶ 43; Defs.'s 56.1 Counter ¶ 150; *see also* AR 1801–1802.) The shot clock therefore recommenced on that day, and the deadline was equivalently set sixteen days later, or October 7, 2020.

The Complaint was filed on October 15, 2020, more than a week after the 150-day mark had passed, or approximately 158 days of non-tolled time. This alone supports Plaintiffs' position and establishes a presumption that the delay was unreasonable. *See* 2009 FCC Order ¶¶ 3, 42, 44.

Moreover, the Town's choice to remove the application from its agenda further militates towards establishing this presumption. Since the Complaint was filed, the proposed cell tower project has not been before the Planning Board or ZBA, (Pls.'s 56.1 Counter ¶ 49), leaving the application in limbo ever since. As the Town notes in its moving papers, "there was no decision on Tarpon's application and additional processing by the Planning Board and ZBA is required." (Defs.'s Reply Mem. 4.) But the "practice of not considering matters subject to pending litigation"—namely, the application at issue—"finds no support in the TCA." *Am. Towers, Inc. v. Wilson Cty.*, No. 10-CV-1196, 2014 WL 28953, at *15, *14 (M.D. Tenn. Jan. 2, 2014). To that end, a court in the Second Circuit has dismissed a cause of action under this provision because a municipality issued a decision on the application at issue, albeit doing so after the complaint was filed. *See Up State Tower Co, LLC v. Vill. of Lakewood*, 431 F. Supp. 3d 157,

170 (W.D.N.Y. 2020), *appeal dismissed* (Mar. 12, 2020) ("The ZBA issued a written decision shortly after Plaintiffs brought this action for injunctive relief. . . . . Because in this case the ZBA issued a decision, which in turn gave rise to the Amended Complaint, Plaintiffs' request for injunctive relief on the basis of an untimely decision is denied as moot.").  Therefore, the Town's initial failure to issue a decision establishes this presumption, and its subsequent inaction more firmly entrenches this presumption every day this litigation is pending.

### b.  Rebutting the Presumption

The Town argues that even if the presumption is established, the Town and its Planning Board can rebut that presumption for several reasons, each of which contributed to the time required to adjudicate the decision: the time required "to retain an RF specialist, not to mention for the specialist to review the application and provide his or her expert opinion"; the difficulties imposed by "the hardships of the Covid pandemic, which no doubt delayed everyone involved in the process"; and the onslaught of complaints lodged "by extremely concerned local homeowners who called to the Planning Board's attention issues."  (Defs.'s Opp. 5–6.)  The Town also cites the time necessary to comply with SEQRA, as similarly rebutting the presumption on behalf of the ZBA.  (*Id.* at 6.)  The Court will discuss each asserted factor in turn.

### i.  Retaining an RF Specialist

Because the Town's independent RF specialist completed his work a month in advance of the initial shot clock deadline, and months in advance of the shot clock's final deadline, the Town's argument regarding the time necessary to retain an RF specialist is unpersuasive.

As detailed above, the Town successfully retained Fishman early in the process, and he had performed an initial (and favorable) review of Verizon's RF report by March 2020.  (Defs.'s

56.1 Counter ¶ 72.)  Fishman's work was admittedly not done at that time; rather, Fishman raised wholly appropriate questions regarding whether adequate service could still be provided from a lower tower height and [thus] stated he would like to see propagation maps for such heights."  (*Id.* ¶ 73.)  But by the following month, Plaintiffs had mollified Fishman's concerns, explaining why a lower monopole height was not viable.  (*Id*. ¶¶ 77–81.)  Fishman thereafter agreed with Plaintiffs, writing in his supplemental report that he concurred with Verizon's analysis that "lowering the tower's proposed height by 20' would result in gaps along Route 9D and a 'significant portion of residential area to the south of the proposed site.'"  (*Id*. ¶ 82.) Fishman went on to say in that same report, "[a]llowing the monopole to be constructed as proposed is really the best solution . . . [and] [r]educing the height would not only decrease the efficacy of the site, but will also increase the likelihood of subsequently needing additional sites in the area."  (*Id.* ¶ 83 (quotation marks omitted).)  Finally, Fishman called Verizon's RF reports "acceptable from an RF Engineer Standpoint."  (*Id.*)  Thus, Fishman's work was submitted and completed on April 20, 2020, one day and one month before the initial 150-day shot clock deadline, and months before the final shot clock deadline when accounting for the several tolling agreements struck between the Parties.

The Court sees no reason that one month, let alone five and a half, was insufficient to review the reports, and the Town fails to provide one.  Therefore, the Town's argument regarding an independent RF expert argument in no way rebuts this presumption.

### ii.  Covid

The Town's argument that the Covid pandemic was a source of delay that renders its decision-making timeline reasonable also falls short for several interrelated reasons.  No one can doubt that Covid has infected every aspect of civil society, *cf. Food & Drug Admin. v. Am. Coll.*

*of Obstetricians & Gynecologists*, 141 S. Ct. 578, 580 (2021) (Sotomayor, J., dissenting from grant of application for stay) ("The COVID–19 pandemic has [] made many typical activities more difficult and dangerous."); *Doe v. Franklin Square Union Free Sch. Dist.*, No. 21-CV-5012, 2021 WL 4957893, at *1 (E.D.N.Y. Oct. 26, 2021) (referring to "dealing with the myriad challenges spawned by the COVID-19 pandemic" as a "web that has entangled our nation"), and the Court does not do so here.  The Court instead questions only whether this argument carries the Town's water.

In making this argument, the Town cites no caselaw nor any evidence to expound upon, let alone substantiate, its claim.[13]  Nonetheless, some evidence speaks to the Town's argument. As Planning Board Chairman Bruce Flower noted that the Town Board canceled meetings in light of Covid, meaning there were no meetings "for a month and a half."  (AR 1491 (transcript of July 20, 2020, Planning Board meeting).)

Multiple issues, however, undermine the Town's argument.  First, the pandemic started months after the application was submitted, meaning a substantial portion of the shot clock transpired before pandemic-related concerns became a factor.  "The World Health Organization declared the Novel Coronavirus Disease, COVID-19, a global pandemic on March 11, 2020. Two days later, on March 13, the United States declared the pandemic a national emergency." *Fernandez-Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 327 (S.D.N.Y. 2020).  It is certainly

---

[13] To date, two courts to have heard cases sounding in TCA claims—one of which analogously adjudicated both an unreasonable delay in violation of 47 U.S.C. §§ 332(c)(7)(B)(ii) and the effective prohibition of wireless services in violation of 47 U.S.C. §§ 332(c)(7)(B)(i)(II), and another which only dealt with the former claim—in which Covid played a role.  *See Crown Castle Fiber LLC v. City of Charleston*, 448 F. Supp. 3d 532, 546 n.6 (D.S.C. 2020); *Up State Tower Co. v. City to N. Tonawanda, New York*, No. 19-CV-01082, 2020 WL 9848450, at *8 n.5 (W.D.N.Y. Sept. 28, 2020).  However, Covid played a role in the remedy phase of each of those cases rather than the substantive analysis.  *See id*.

the case that "even in the weeks and months prior to those declarations, WHO and other public health organizations were warning about the potential of the virus to infect and kill untold numbers of people around the globe," *id.*, but there exists no evidence in the record that the Town's prior meetings were postponed as a result of Covid.  Moreover, the evidence in the record suggests that a meeting occurred on March 16, 2020.  (*See* AR 722 (noting on the agenda for the May 4, 2020, meeting included "Acceptance of the Minutes from March 16, 2020").)  Even if the Court were to consider the pandemic justification viable once the WHO declared the pandemic—a conservative estimate—then 79 days in this 150-day deadline would already have expired, more than half the Town's allotment.  As such, this justification only goes so far.

Second, the Town has already received leniency as a result of Covid in the form of Plaintiffs' consent to multiple tolling agreements.  During the July 20, 2020, Planning Board meeting, Chairman Flower noted: "I believe that the shot clock was extended because of the Covid situation."  (AR 1491 (transcript of July 20, 2020, Planning Board meeting).)  Documentary evidence confirms this belief, as Tarpon admitted that it consented to a tolling agreement because "the Planning Board was acting reasonably and expeditiously on its application (*particularly in light of the Covid pandemic*)."  (Pls.'s 56.1 Counter ¶ 23 (emphasis added).)  Thus, the Town's apparent month-long delay was rewarded with more than a month's worth of tolling the shot clock.  Subsequently, Plaintiffs continued to extend the shot clock multiple times, demonstrating their willingness to accommodate the Town.  (*See, e.g.*, Defs.'s 56.1 Counter ¶ 96 (tolling the shot clock for another 45 days on May 29, 2020); *id.* ¶ 150 (tolling the shot clock on August 18, 2020, through August 31, 2020); *id.* (tolling the shot clock through September 21, 2020).)  As such, the Town has already received the benefit of having worked through the growing pains of operating during Covid in the form of Plaintiff's good faith efforts

to accommodate it via multiple tolling agreements, at least one of which was the direct result of the covid pandemic.

Finally, to the extent the Town ought to be afforded a wider berth given the pandemic, that leniency must be curtailed upon the resumption of proceedings virtually.  There is no dispute that the Town and its various administrative agencies were able to conduct meetings on Zoom.  (*See, e.g.*, AR 721 (Notice of May 4, 2020, Panning Board meeting explaining that it, and subsequent such meetings, would be held on Zoom); AR 1073 (Notice of June 23, 2020, Public Hearing for ZBA to take place on Zoom).)  Because the Town was able to resume operations notwithstanding the pandemic, it cannot continue to return to that well.  In sum, the Covid pandemic does not adequately rebut the presumption already established.

### iii.  Local Property Owners' Complaints

Finally, the Town asserts that its delay was caused in part because, "[w]hen the Planning Board was able to schedule a public hearing, it was beset by extremely concerned local homeowners who called to the Planning Board's attention issues regarding siting of the proposed tower (particularly in regard to visual impacts) which had not previously been fully explored." (Defs.'s Opp. 6.)  This argument, too, cannot withstand scrutiny.

In the first instance, aesthetic concerns were discussed at length at both the January and May Planning Board meetings.  In the January meeting, Chairman Flower spoke to aesthetic concerns ranging from the color of the monopole to greenery surrounding it, including referencing the aesthetics of past cell towers the Planning Board had approved.  (*See* AR 443–449 (January 22, 2020, Planning Board Meeting Transcript).)  At the conclusion of this preliminary discussion, Chairman Flower stated his desire to hold off on aesthetic decisions until the public had a chance to weigh in:

> [W]e'll see as the comments come in, you know, because obviously we'll have to go to a public hearing.  Once the public, you know, once we get you know, from their point of view, you know, at least they'll help us to make a decision of which way, you know, need to go.  But I think on the board's view, only because that we've you know, again, past practice, we would approve these with some type of screening around the antennae.  I think that's -- that would be proper for this project, regardless.

(AR 449.)  Right after the Chairman made this comment, the Board then discussed different photos visualizations that had been pre-approved.  (*See id.* at 450–453.)  And as the Town conceded, no one raised any concerns "with respect to either the scope or completeness of the VRE" during this meeting.  (Defs.'s 56.1 Counter ¶ 70.)

Tarpon also made a submission on the day of the board meeting, which included, as requested, a "visual study [that] had select views that showed the monopine, as opposed to a monopole."  (AR 737; *see id*. at 490–498 (submitting a VRE at the January 22, 2020, Planning Board meeting, including photographs of a proposed monopine at AR 492, AR 495).)  And over the following weeks, Plaintiffs continued working to solicit all necessary feedback, including regarding visual or aesthetic concerns.  For example, Plaintiffs corresponded with the State and Tribal Historic Preservation Office (SHPO/THPO), who "concurred" that there would be no visual effect on historic properties.  (*See* AR 717.)  In light of these inquiries as to the aesthetic features of the proposed cell tower, it cannot be said that aesthetic issues "had not previously been fully explored," as the Town argues.  (Defs.'s Opp. 6.)

These discussions continued in May, when the Planning Board resumed following the onset of the Covid pandemic.  During the May Planning Board meeting, multiple board members made comments regarding the project's aesthetics.  Indeed, Boardmember David Stolman stated that this discussion would be "dealing with the height of the tower, the location of the tower, [and] the appearance of the tower."  (AR 735.)  Thereafter, there was a discussion about "the

appearance of the tower and to determine whether it should be camouflaged or whether it should be . . . the basic steel design without the camouflage." (*Id.* at 736.) This discussion, once again, brought in the aesthetics of cell towers in the area in the hopes of "staying consisten[t], and also . . . [whether] it's going to blend in better with the surroundings." (*Id.* at 737.)

So, too, did members of the public speak to aesthetic concerns during this meeting. For example, one property owner stated: "We would be in direct site of this -- of this cell tower if it went up. It would be literally in our backyard. It would be aesthetically displeasing to us." (*Id.* at 850.) Another opined: "We share the concerns of the devaluation of real estate and the potential, you know, devastating impact it might have to us and our neighbors as well as the overall aesthetics of the neighborhood and the town." (*Id.* at 855.) Yet another resident asked about the monopole versus monopine decision as it related to her concerns over the "scenic beauty" of Wappinger. (*Id.* at 858.)[14] Members of the public even questioned whether the Parties conducted "a proper assessment." (*Id.* at 860.) But these complaints were lodged more than five months before the shot clock's eventual deadline—in fact, more than 150 days out from the final deadline. That the Planning Board received a barrage of comments months in advance of the shot clock deadline militate against a finding that its delay in processing the application for sake of the community's response was reasonable.

This point is only made stronger by the submission of a Memorandum in Opposition of the special permit, wetlands permit, area variance and site plan approval by attorney Andrew Campanelli submitted June 11, 2020, on behalf of local property holders. (*See generally id.* at

---

[14] Even more residents spoke during the meeting to aesthetic concerns, but the Court need not recite each. (*See, e.g.*, AR 860–861.) Suffice it to say that members of the public unquestionably raised such concerns.

942–1066.)  Several of the points Campanelli makes deal with state law concerns not before the Court.[15]  Applicable to this inquiry, however, is the fact that Campanelli raised the same aesthetic concerns aired at the May public hearing.  (*See id.* at 951–952.)  And like the concerns raised at the public hearing, Campanelli also suggested that the VRE submitted is "inherently defective" because "it does not include a single image from <u>any</u> [of] the nearby homes which will sustain the most severe adverse aesthetic impacts from the installation of the massive tower which *Tarpon Towers* seeks to construct in such close proximity to those homes."  (*Id.* at 955 (emphasis in original).)  But, again, this memorandum was filed almost four months in advance of the deadline, which, again, bespeaks how much time the Board had to consider it.

Moreover, the force of this memorandum as contributing to the Board's burden to review the public response is undermined by its signatories.  The memorandum was signed by thirty-one individuals, but represents only 13 total properties, (*id.* at 943–944; *see also* Pls.'s 56.1 Counter ¶ 32), several of whom had already voiced their opposition on the same bases in the public hearings, (*compare* AR 943–944 (listing signatories of James Bolz, Donald Bolz, Karen McNamara-Bolz, Seth Flamholtz, and John Bohuniek) *with id.* at 845–49 (statement of John Bohuniek) *and id.* at 850–852 (statement of Donald Bolz) *and id.* at 853–854 (statement of Karen Bolz) *and id.* at 860–861 (statement of Seth Flamholtz)).  Given when the memorandum was filed, and its substantive recitation of arguments already made, the Town cannot rely upon it in service of its argument that the delay was reasonable for sake of public outcry.

---

[15] For example, whether the application meets the standards for site plan approval.  (*See* AR 956–960.)

### c.  Evidence of Pretext Against the Town

It is also in the discussion of the Town's rebuttal of the presumption, that Plaintiffs' argument concerning the pretextual nature of the Town's actions comes to bear.  The FCC's Shot Clock order "contemplates not just that a local government will take some action on an application within the deadline, but that it will '*resolve* [the] application' before the deadline."  *New Cingular Wireless PCS, LLC v. Town of Stoddard, N.H.*, 853 F. Supp. 2d 198, 203–04 (D.N.H. 2012) (emphasis added) (quoting 2009 FCC Order ¶ 38).

But the events immediately following the issuance of the draft negative declaration as well as the comparative nature of the declarations themselves militates against the Town's ability to rebut the established presumption and suggest instead that this course of action was an effort by "'local authorities [to] keep[] wireless providers tied up in the hearing process' through invocation of state procedures, moratoria, or gimmicks."  *Lucas*, 7 F. Supp. 2d at 321–22 (S.D.N.Y. 1998) (quoting *Sprint Spectrum L.P. v. Town of Easton*, 982 F. Supp. 47, 50 (D. Mass. 1997)); *see also Masterpage Commc'ns, Inc. v. Town of Olive, NN*, 418 F. Supp. 2d 66, 77 (N.D.N.Y. 2005) (same).  Rather, the evidence at issue buttresses, not rebuts, the presumption that the Town failed to act in a reasonable period of time.

### i.  Events Proceeding the Negative Declaration

The Town's decision to reverse course, and the justifications used for doing so, lend persuasive weight to the argument that it failed to act in a reasonable period of time.  Again, a recitation of the facts regarding events surrounding the issuance of a draft negative declaration and thereafter a positive declaration are illuminating.

At the end of the July 6, 2020, public hearing, following the multiple instances in which concerned citizens made their opposition to the project known, the Planning Board voted

37

unanimously to pass a resolution for the Town Planner to draft a negative SEQRA declaration. (Defs.'s 56.1 Counter ¶ 119). Nine days later, Plaintiffs submitted a noise study detailing how "the anticipated noise levels will be much lower than that experienced for normal conversation." (AR 1416, 1415–1417.) Two days after that, the Town Planner circulated a draft of the negative declaration, which included detailed explanations of why the proposed cell tower would not pose any environmental impacts, including providing a three-paragraph, detailed explanation of why the proposed tower would "not have a significant adverse environmental impact on any scenic or aesthetic resources." (*Id.* at 1422–1423).

Mere days after that, however, the Planning Board reversed course. First, it voiced newfound concerns via a comment letter regarding the visual study's scope that the Planning Board had previously cleared. (*See id.* at 1513–1515.) This letter also regurgitated the aforementioned aesthetic concerns already voiced at the public hearings and captured in Campanelli's memorandum. (*See id.*) Lastly, the Planning Board requested information on three alternative sites for the cell tower, including one Plaintiffs had already reviewed and determined would not be viable. (Defs.'s 56.1 Counter ¶ 135.)

"As the [TCA] itself recognizes, inaction can take not only the form of complete inactivity, but also the absence of any meaningful consideration of an application. Otherwise, a local zoning authority could indefinitely delay an application by a flurry of hearings, requests, and counter-submissions that effectively mask a denial." *Nextel Partners*, 62 F. Supp. 2d at 694 (rejecting argument that "failure to act" claim under TCA not ripe because application still in information-gathering stage). The Board's repetition of the concerns already voiced in multiple forums, its raising of studies previously accepted, and its request of information on alternative sites months into the process, including one that was already previously evaluated, evinces an

intent to "delay[] the application by repeatedly requesting unnecessary information and belaboring issues already resolved." *MetroPCS*, 739 F. Supp. 2d at 424.  Accordingly, this course of events undermines any efforts by the Town to rebut the presumption established.

<u>ii.  The Declarations Themselves</u>

The comparative detail—or lack thereof—in the negative and positive declarations also suggests that the Town's issuance of a positive declaration, thereby triggering additional administrative burdens pursuant to SEQRA, was nothing more than a "delaying tactic[]." *Lucas*, 7 F. Supp. 2d. at 322.  For this reason, the declarations also undercut the Town's attempt to argue that it acted in a reasonable period of time.

The first reason given for the positive declaration is that the project could create a material conflict with a community's plans or goals.  (*See* AR 1818.)  The explanation for this criterion reads, in full: "The Planning Board believes that the *potential* may exist for the proposed monopole or monopine to conflict with the *legislative intent* of § 240-81 of the Town code which addresses telecommunications towers, antennas, and personal wireless service facilities."  (*Id.*) (emphases added).  There is no justification or explanation as to the basis of this belief.  Indeed, the Town concedes that the "positive declaration did not explain the Planning Board's basis for concluding that Tarpon's proposed tower conflicts 'with the legislative intent of § 240-81 of the Town Code.'"  (Defs.'s 56.1 Counter ¶ 155 (quotation marks omitted).)

The same conclusory statements were offered with respect to the second criterion the Planning Board cited to justify the positive declaration, namely the neighborhood's character.  Again, the portion of the declaration on this factor reads in its entirety:

> The Planning Board believes that the potential may exist for the proposed monopole or monopine to result in significant adverse visual impact to the surrounding community which is bucolic and historically agricultural in nature thereby

potentially causing significant adverse impairment to the character or quality of the existing community and the aesthetic resources of the surrounding area.

(AR 1818.)  Once again, the Board does not explain this "potential," and its silence stands in stark contradiction to the draft negative declaration that came to the opposite conclusion and offered multiple paragraphs articulating the reasons for its conclusion.  (*See supra* II.B.2.c.i.)[16]

The Second Circuit as well as district courts therein have previously found that "conclusory" statements or assertions made in the context of constructing cell towers and TCA

---

[16] More specifically, the draft negative declaration details the fact that "[e]xisting and potential visibility of the wireless telecommunications tower and visual impacts were evaluated in the Applicant's Visual Report and presentations to the Planning Board."  (AR 1422.)  The draft declaration summarizes said report and presentations as follows:

> On December 7, 2019, a publicly noticed "balloon test" was performed by the Applicant. The height of the proposed structure was simulated by floating a 3-foot diameter, helium-filled weather balloon at 150 feet. The balloon provided reference points for height as well as location and also provides a known dimension that aids in the production of photo simulations. On December 23, 2019, the Applicant submitted a Visual Resource Evaluation which contained photo simulation views of the proposed 150-foot monopole. . . . The Applicant also prepared a Supplemental Visual Resource Evaluation that built on the original visual assessment by providing photo simulations of a silver monopole, monopine, and a blue monopole from two of the viewpoints.

(AR 1422–1423.)

Having detailed the information the Planning Board considered, the draft negative declaration then summarized the Planning Board's conclusion as follows: "Based on the photo simulations, the Planning Board has determined that while the monopine is more visible than the silver and blue monopoles, *none of the proposed poles would create a significant adverse environmental impact*." (AR 1423 (emphasis added).)  Thereafter, the draft declaration also notes that "[t]he regulatory review of the application also included consultation with the New York State Office of Parks, Recreation, and Historic Preservation (NYSOPRHP)" and that "[o]n April 30, 2020, the NYSOPRHP issued a sign-off determination that the Proposed Action will have no impact to Federal or State designated aesthetic, scenic, historic, or archeological resources as a result of the balloon tests and photo simulations submitted for review."  (AR 1423; *see also* AR 717 (correspondence with NYSOPRHP, who "concurred" with Plaintiffs' assessment that there would be no visual effect).)  Again, this level of detail and explanation is a far cry from the barebones positive SEQRA declaration that was ultimately adopted.

actions are unreliable.  *See, e.g.*, *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 536 (2d Cir. 2005) (rejecting "conclusory" assertions regarding viable alternative cites); *Up State Tower Co., LLC v. Town of Kiantone, New York*, No. 16-CV-00069, 2019 WL 1117220, at *10 (W.D.N.Y. Mar. 11, 2019) (same), *adhered to on denial of reconsideration*, 2019 WL 6320335 (W.D.N.Y. Nov. 26, 2019), *aff'd* 820 F. App'x 75 (2d Cir. 2020) (summary order); *New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trustees*, 812 F. Supp. 2d 143, 157 (E.D.N.Y. 2011) (rejecting "conclusory assertions that property values would decrease"); *Ramapo*, 701 F. Supp. 2d at 462 (same).  The Court analogously finds that such conclusory statements here, absent any articulation of these "potential" concerns, do not pass muster, especially when contrasted with the detailed explanations provided for a contrary conclusion earlier in the process.[17]

This instead appears to be a solution in search of a problem.  Because there is little doubt that "a positive SEQRA declaration necessarily delays a final decision," *New York SMSA*, 118 F. Supp. 2d at 341, allowing the Town to rely upon conclusory justifications to invoke SEQRA "would be to allow every locality in New York to rely on SEQRA to frustrate the clear mandates of the Telecommunications Act," *Lucas*, 7 F. Supp. 2d at 322.  In conclusion, the Town failed to rebut the established presumption; therefore, with respect to this claim, the Court grants Plaintiffs' Motion and denies the Town's Motion.

---

[17] The Court presumes that this is in reference to sub-paragraph (5), which reads: "Preserve property values."  However, the Court cannot rely on its own conjecture.  Moreover, many of the other legislative goals codified in these nine subparagraphs would seemingly be realized by this project.  For example, one is minimizing the total number of cell towers.  (*See* AR 1287 (reprinting Town Code § 240-81(B)(6).)  The proposal meets this aim.  (*See* AR 708 (Fishman supplemental report) (stating that "[r]educing the height would not only decrease the efficacy of the site[s], but will also increase the likelihood of subsequently needing additional site in the area.").)  That the positive declaration fails to note these sorts of nuances or suggest one factor weighs more than another proves its inadequacy.

### 3.  Effective Prohibition Claim

Plaintiffs assert that given its course of actions, the Town has effectively prohibited the provision of personal wireless services to its constituency in violation of FCC rules.  (*See* Pls.'s Mem. 22–25.)  The Town parries this argument by asserting that Plaintiffs cannot meet the requisite standards to make such a claim.  (*See* Defs.' Opp. 7–8.)

Conversely, the Town asserts that summary judgment should be granted in its favor because Plaintiffs fail to state a claim, as Plaintiffs' "application for approval of its proposed cell tower has not been denied," thereby mooting the claim.  (Defs.'s Mem. 19.)  Plaintiffs respond by stating that this "is not a defense," as Plaintiffs have adequately demonstrated that a gap exists.  (Pls.'s Opp. 15.)  While Plaintiffs are correct that the Town failed to cite to any caselaw supporting this defense, (*see* Pls.'s Opp. 15; Defs.'s Mem. 19), caselaw standing for this proposition exists and is appropriately applied to the situation at bar.

To be sure, "§ 332(c)(7)(B)(i)(II)'s 'effective prohibition' provision is not nearly as clear on its face" as it could be.  *New Cingular*, 853 F. Supp. 2d at 207.  The provision reads, in full measure: "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).

Notwithstanding the opacity of the language, courts have routinely dismissed claims under this provision when the municipality in question has not issued a final ruling on an application.  *See New Cingular*, 853 F. Supp. 2d at 208 ("Because the Board did not render a final decision denying New Cingular's application, New Cingular's claims under 47 U.S.C. §§ 332(c)(7)(B)(i)(II) and 332(c)(7)(B)(iii) are premature, and must be dismissed."); *Glob. Tower*

*Assets, LLC v. Town of Rome, Me.*, No. 14-CV-00085, 2014 WL 3784233, at *10 (D. Me. July 31, 2014) (dismissing without prejudice cause of action under, inter alia, § 332(c)(7)(B)(i)(II), as not ripe for review because there had been no "final action," even though the plaintiff had received an unfavorable decision from the town's planning board but had failed to pursue an available appeal to the town board of appeals), *aff'd sub nom. Glob. Tower Assets, LLC v. Town of Rome*, 810 F.3d 77 (1st Cir. 2016); *Cox Commc'ns PCS, L.P. v. City of San Marcos*, 204 F. Supp. 2d 1272, 1277 (S.D. Cal. 2002) ("[B]ecause the defendants have not rejected Sprint's application for an excavation permit or a CUP, they have not taken any final action.  Because no decision or final action has been made on Sprint's request, the company has failed to state a cause of action under §§ 332(c)(7)(B)(i)(I) and 332(c)(7)(B)(i)(II)." (italics omitted)).  Moreover,

> [t]his interpretation requiring a "decision" or "final action" is consistent with the other provisions of the [TCA].  Section 332(c)(7)(A) says that "nothing in the chapter" should affect the local government in its "decisions" regarding local cell sites.  Also, subsection (iii) says how the "decisions" should be in writing and supported by substantial evidence.  Furthermore, any interpretation of §§ 332(c)(7)(B)(i)(I) and 332(c)(7)(B)(i)(II) that allows applicants to challenge the laws, rather than decisions, would be superfluous because 47 U.S.C. § 253 already gives applicants this option.  Where 47 U.S.C. § 253 provides a cause of action against local regulations, section 332 gives a cause of action against local decisions.

*Cox Commc'ns*, 204 F. Supp. 2d at 1277 (italics omitted).

The positive declaration under SEQRA undoubtedly engenders additional obstacles, but the application must navigate and clear each one before a municipality can issue a final judgment.  *See Lucas*, 7 F. Supp. 2d at 315 (reviewing the steps required to obtain a final decision after a positive SEQRA declaration; *Feiner*, 734 F. Supp. 2d at 420–21 (same).  While additional rounds of review pursuant to SEQRA may well "be expensive, inefficient, time-consuming, and ultimately futile . . . 'impracticalities, time delays, expense and other inefficiencies' does not amount to 'harm . . . sufficiently strong to outweigh the unfitness for

review embodied in the ripeness doctrine.'" *Up State Tower Co., LLC v. Town of Kiantone, New York*, No. 16-CV-00069, 2016 WL 7178321, at *7 (W.D.N.Y. Dec. 9, 2016) (quoting *Sprint Spectrum L.P. v. City of Carmel, Indiana*, 361 F.3d 998, 1004–05 (7th Cir. 2004)), *aff'd*, 718 F. App'x 29 (2d Cir. 2017).

For the foregoing reasons, the Court agrees and adds its harmony to the chorus; Plaintiffs' claim is not yet ripe for adjudication.  Accordingly, Plaintiffs' Motion with regard to this claim is denied and the Town's Motion with regard to this claim is granted.

### 4.  Remedy

Because the TCA fails to articulate a specific remedy for cell tower siting violations, "the [C]ourt has full discretion in determining what proper injunctive relief is warranted for a violation of the shot clock." *Charleston*, 2021 WL 538148, at *8.  Plaintiffs request injunctive relief.  (Pls.'s Mem. 19–20.)

At the outset, it must be said that courts remedying TCA violations of any kind typically journey down one or two paths: issuing an injunction mandating a municipality approve a given application, including ordering the municipality issue the necessary zoning permits, or remanding the issue back to the municipality to make a decision in an expedited fashion.  *See* supra II.B.1.c.

Broadly speaking, the former is appropriate for violations of 47 U.S.C. § 332(c)(7)(B)(iii), which demands all decisions "be in writing and supported by substantial evidence contained in a written record." *See, e.g.*, *Greenburgh*, 2013 WL 3357169, at *21 ("In the majority of cases, the appropriate remedy for a violation of Section 332(c)(7)(B)(iii) is an order requiring the locality to issue the permit sought") (collecting cases), *aff'd*, 552 F. App'x 47 (2d Cir. 2014); *Cellco P'ship v. Town of Clifton Park, New York*, 365 F. Supp. 3d 248, 265

44

(N.D.N.Y. 2019); *VWI Towers, LLC v. Town of N. Andover Plan. Bd.*, 404 F. Supp. 3d 456, 470 (D. Mass. 2019).

The latter remedy is considered appropriate in two situations. First, injunctions for violations of the same "substantial evidence" provision but where there was "good faith confusion by a board that has acted quite promptly." *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 24 (1st Cir. 2002). Second, for violations of the "reasonable period of time" provision, § 332(c)(7)(B)(ii), as expounded upon by the FCC's shot clock order. *See, e.g.*, *Kiantone*, 2016 WL 7178321, at *7 (granting relief for a § 332(c)(7)(B)(ii) in the form of an order that Defendants "render a decision on the Application within twenty (20) days"), *aff'd*, 718 F. App'x 29 (2d Cir. 2017).

The FCC has implied a preference for the latter option for violations of the shot clock order, declaring that a "local authority's exceeding a reasonable time for action would not, in and of itself, entitle the siting applicant to an injunction granting the application." 2009 FCC Order ¶ 32 n. 99. At least one court in this district has agreed with this view, albeit in dicta. *See* *Greenburgh*, 2013 WL 3357169, at *17 (opining that "the only reasonable [equitable] relief for [a violation of § 332(c)(7)(B)(ii) is] to require a written decision," but because the defendant municipality had issued a decision on the application after the complaint was filed, the "[p]laintiff has already received the relief to which it would be entitled" (quoting *Wilmington*, 2010 WL 3463729, at *4)).

In reviewing analogous caselaw, "the [C]ourt has only found one case in which a court granted injunctive relief solely for the violation of § 332(c)(7)(B)(ii)." *Crown Castle*, 448 F. Supp. 3d at 545 (citation omitted). As the Second Circuit summarized, in that case, "the local government unreasonably adopted a moratorium on cellular towers, and extended the

moratorium over a two-year period." *Up State Tower*, 718 F. App'x at 32 (citing *Masterpage*, 418 F. Supp. 2d at 78). Here, "while [the Town] certainly has been dragging its feet, some progress has been made." *Crown Castle*, 448 F. Supp. 3d at 545. Accordingly, notwithstanding the Court's conclusion that the Town invoked SEQRA to delay the application—a conclusion from which it does not shy away—the Town's obstruction does not rise to the level of the "abusive behavior" found in *Masterpage* necessitating injunctive relief. *Up State Tower*, 718 F. App'x at 32. Moreover, ordering the Town to render a decision on Plaintiffs' application in "a short, finite interval" is not only "in accordance with the purpose of the TCA," but it will also preserve Plaintiffs' ability to "still bring suit [a] alleging that the reasons for the Town's subsequent denial are not supported by substantial evidence, and the presumptive remedy for that violation is an affirmative injunction." *Id.* at 31–32.

In light of the circumstances, the Court concludes that remand to the Town to make a final decision on Plaintiffs' application within 60 days is the appropriate remedy.[18]

### III.  Conclusion

For the foregoing reasons, the Court grants Plaintiffs' Motion with respect to its First claim for a violation of § 332(c)(7)(B)(ii) and the Shot Clock Order and denies Plaintiffs' Motion with respect to its claim for a violation of § 332(c)(7)(B)(iii); accordingly, and conversely, the Court denies the Town's Motion with respect to the first claim and grants it with respect to the

---

[18] As stated above, the Court is not indifferent "to the 'current environment' affecting the parties, namely, the COVID-19 pandemic." *Crown Castle*, 448 F. Supp. 3d at 546 n.9. The Court "is attempting to prod the [Town] to take action on the pending applications as soon as practicable. In normal times, the deadline would have been 30 days." *Id.*; *see also N. Tonawanda*, 2020 WL 9848450, at *8 n.5 (affording extra time for the defendant township to issue a decision following a violation of 47 U.S.C. § 332(c)(7)(B)(ii) to "account[] for conditions caused by the current COVID-19 pandemic").

second claim.  The Town is hereby ordered to render a decision on the Application within sixty

(60) days of this Opinion and Order.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos.

27, 32).

SO ORDERED.

DATED:        January 31, 2022
              White Plains, New York

_____
         KENNETH M. KARAS
       United States District Judge